# UNITED STATES DISTRICT COURT
### for the District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| Storage unit E-191, StorQuest Self Storage facility located at 16980 Cottonwood Drive, Parker, Colorado 80134, more fully described in Attachment A, attached hereto. | ) ) ) ) |

Case No. 16-sw-05321-MEH

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances |
| 21 U.S.C. § 846 | Conspiracy to violate Controlled Substances Act |
| 18 U.S.C. 1956(a)(1)(A)(i) | Money Laundering |
| 18 U.S.C. 1956(h) | Conspiracy to Commit Money Laundering |

The application is based on these facts:

X Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Tyler Brown*
_____

SA Tyler Brown, Drug Enforcement Administration
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **14 Apr 2016**

*Michael E. Hegarty*
_____
*Judge's signature*

City and state: ___Denver, CO___

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

## <u>ATTACHMENT A</u>

The SUBJECT PREMISES is described as storage unit E-191, StorQuest Self Storage facility located at 16980 Cottonwood Drive, Parker, Colorado 80134.  The SUBJECT PREMISES has a green, metal, garage type door with a metal lock mounted on the right hand side of the door. The letter and digits "E-191" are affixed above the garage type door. The SUBJECT PREMISES is located within Building "E" on the West side of the hallway.   Building "E" is the first building encountered beyond the entrance gate and is visible from the entrance to the complex.  Building "E" is of cinder or concrete block construction, brown in color, with a visible "E" sign located on the top center portion of the north facing building wall.





**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEIZED**

1.  Any evidence related to violations of Title 21, United States Code, Sections 841 and 846, including:

    A.  All DEA 222 Order Forms used for the ordering of Schedule II controlled substances;

    B.  All invoices for the purchase of controlled substances Schedules III-V;

    C.  All logs, notes, ledgers, etc. used to identify the person purchasing dispensed controlled substance prescriptions at the pharmacy;

    D.  Any prescription for a controlled substance which was accepted by the pharmacy, but not filled;

    E.  Any prescription for a controlled substance which was accepted by the pharmacy and dispensed;

    F.  All letters, emails, notes, or recorded communications of any kind documenting communication between any employees of CROWN POINT PHARMACY, SKY RIDGE PHARMACY, and/or SKY RIDGE COMPOUNDING PHARMACY;

    G.  All letters, emails, notes, or recorded communications of any kind documenting communication between any employee of CROWN POINT PHARMACY and Dr. John Alan LITTLEFORD, DO;

    H.  All letters, emails, notes, or recorded communications of any kind documenting communication between CROWN POINT PHARMACY, SKY RIDGE PHARMACY, and/or SKY RIDGE COMPOUNDING PHARMACY and any of their controlled substance suppliers;

    I.  All inventories, counts, or audits of controlled substances to include, but not limited to, perpetual inventories and biennial inventories;

    J.  All records showing the receipt of controlled substances, theft and los records, destruction records; and

    K.  Any calendars or datebooks.

2.  Any patient/customer files for the following individuals and any other patients or practitioners known or unknown to investigators at this time:

    A.  John BRADSHAW – DOB 10/23/69; Death 12/27/11

    B.  Richard CARBONE – DOB 6/25/84; Death 6/2/12

    C. Joel KENNEDY – DOB 6/18/78; Death 10/2/12

    D. Kimberly MCMILLAN - DOB 8/27/68; Death 9/1/11

    E. Benjamin PACKER – DOB 10/17/1980; Death 10/7/12

    F. John PLATO - DOB 7/19/71; Death 8/3/12

    G. Scott RUSSELL – DOB 10/20/66; Death 1/2/12

    H. Dianna SMITHLING – DOB 4/4/77

3. All records that constitute evidence, fruits, or instrumentalities of violations including money laundering promotion (18 U.S.C. § 1956(a)(1)(A)(i)) or money laundering conspiracy (18 U.S.C. § 1956(h)) for the period of January 1, 2010 through present, including the items as listed below:

    A. Documents and information relating to the business receipts of CROWN POINT PHARMACY, CALESKO INC., SKY RIDGE PHARMACY, LISTCO INC., and/or SKY RIDGE COMPOUNDING PHARMACY, including dispensing records of the pharmacy, transaction receipts, point-of-sale system records, patient payment records, medical insurance billing and reimbursement records, and other indicia of business receipts;

    B. Bank statements, canceled checks, check stubs, deposit tickets, financial statements, ledgers, and accounting records or information related to: CROWN POINT PHARMACY, CALESKO INC., SKY RIDGE PHARMACY, LISTCO INC., SKY RIDGE COMPOUNDING PHARMACY, SCOTT ESKANOS, and/or STANLEY CALLAS;

    C. Records of controlled substance orders from McKesson Corporation and Cardinal Health;

    D. Records of supply and/or business agreements with McKesson Corporation and Cardinal Health;

    E. Records, information, or items relating to off-site locations used to store records, including receipts and rental agreements for storage facilities; and

    F. Computers, hard drives, flash drives, servers or any form of electronic storage medium, routers, modems, electronic media, and network equipment, or other equipment, software, or other technology that may have been used to commit or to facilitate, or may contain evidence regarding the referenced offenses.

4. For any computer, computer hard drive, server or other physical object upon which computer data can be recorded (herein "COMPUTER") that is called for by this warrant, or that might contain items otherwise called for by this warrant:

A. Evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

B. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

C. Evidence of the lack of such malicious software;

D. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

E. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

F. Evidence of the times the COMPUTER was used;

G. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

H. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

I. Contextual information necessary to understand the evidence described in this attachment; and

J. Volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, DANIEL MCCORMICK, a Diversion Investigator with the Drug Enforcement Administration ("DEA"), being duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AFFIANT BACKGROUND

1. Your Affiant, Daniel McCormick ("Affiant") is employed as a Diversion Investigator ("DI") with the DEA, and has been so employed by DEA since April 2003. Your Affiant has completed Basic Diversion Investigator Training in Quantico, Virginia, in August 2003, which included the identification and investigation of the illegal distribution of pharmaceutical controlled substances. Your Affiant has further participated in numerous investigations involving offenses for distribution of, possession with intent to distribute, and conspiracy to distribute pharmaceutical controlled substances.

2. During your Affiant's career he has also attended training specific to the distribution of pharmaceutical controlled substances and participated in investigations of DEA registrants and individuals relative to the improper prescribing, dispensing, distributing, and obtaining of pharmaceutical controlled substances. Your Affiant and other investigators he has worked with are knowledgeable of the laws, regulations, and procedures pertinent to investigations of the diversion of pharmaceutical controlled substances to illicit markets, as well as techniques employed by registrants and individuals to divert pharmaceutical controlled substances. Your Affiant is currently assigned to the Tactical Diversion Squad (TDS), Denver Division Office. As such, your Affiant has been trained with knowledge applying to pharmaceutical drug cases.

3. Based upon my training and experience in pharmaceutical investigations, your Affiant is familiar with the documents and records required by persons who import, manufacture,

1

package, distribute, dispense, and prescribe pharmaceutical controlled substances. Your Affiant has participated in the execution of search and seizure warrants where assets, documents, records, and pharmaceutical controlled substances have been located and seized. Your Affiant has also had experience in interviewing defendants, witnesses, and other persons who have personal knowledge of the distribution of pharmaceutical controlled substances.

4.   Title 21, United States Code, Section 801 *et seq*., creates a closed system of distribution and defines legal conduct related to the manufacturing, distributing, dispensing, and possessing of controlled substances. This closed system of distribution, per Title 21, United States Code, Section 822(a)(1), requires every person who manufactures or distributes any controlled substance, or who proposes to engage in the manufacture or distribution of any controlled substance, to obtain a registration issued by the United States Attorney General in accordance with the rules and regulations promulgated by him or her. The DEA is the authority who grants the registration to anyone who proposes to or engages in the manufacturing and distribution of controlled substances. Title 21, Code of Federal Regulations, Section 1300 *et seq*. lays out the regulations that further define and clarify the applicable laws. Prescriptions are how a pharmacy legally dispenses a controlled substance. Title 21, Code of Federal Regulations, Section 1306.04(a) states that, for a prescription for a controlled substance to be effective, it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. The responsibility for the proper prescribing and dispensing of scheduled controlled substances is upon the prescribing practitioner, but a corresponding liability rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional

2

treatment or in legitimate and authorized research is not a valid prescription within the meaning and intent of section 309 of the Act (Title 21, United States Code, Section 829). The person knowingly filling such a purported prescription (in this case a pharmacist), as well as the person issuing it (in this case a medical practitioner), shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

5.  The facts in this affidavit come from my personal observations, my training and experience, and information relayed to me by other agents and investigators with years of professional experience in the area of pharmaceutical controlled substance law enforcement.

## PURPOSE OF THIS AFFIDAVIT

6.  Based on the information set forth below, your Affiant respectfully submits that there is probable cause to believe that Stanley ("Stan") G. CALLAS and Scott Alan ESKANOS, and related persons and entities including those identified in this affidavit, have been committing violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956(a)(1)(A)(i) and (h).

7.  Based on the information set forth below, your Affiant respectfully submits there is probable cause to believe that the following premises contain evidence, fruits, or instrumentalities of Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Money Laundering Using Illegal Proceeds to Promote Illegal Activity and Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and (h):

3

    a. **StorQuest Self Storage, Unit E-191, located at 16980 Cottonwood Drive, Parker, Colorado 80134** ("SUBJECT PREMISES"), which is further described in Attachment A, attached hereto and incorporated herein by reference.

8.  This Affidavit supports Applications for Search Warrants authorizing searches of the premises described in Attachment A for the items listed in Attachment B.

9.  As this affidavit is submitted for the limited purpose of securing a search warrant for the SUBJECT PREMISES, as outlined herein, your affiant has not set forth each and every fact learned during the course of this investigation. However, facts not set forth herein are not being relied upon in reaching the conclusion that probable cause exists for the issuance of the search warrant as requested herein, and you affiant does not request this Court consider any facts not set forth herein in reviewing this application.

### BACKGROUND INFORMATION

10.  CALLAS and ESKANOS are the co-owners of CROWN POINT PHARMACY located at 9397 Crown Crest Blvd. #101, Parker, Colorado 80138, and SKY RIDGE PHARMACY located at 10103 Ridge Gate Parkway, Suite 117A in Lone Tree, Colorado.

11.  On September 27, 2005, because the DEA determined the registrations of CROWN POINT PHARMACY and SKY RIDGE PHARMACY constituted an imminent danger to the public health and safety as a result of their filling of prescriptions obtained over the internet, each pharmacy was served with an Order to Show Cause/Immediate Suspension Order concerning its respective DEA registration.

12.  On behalf of CROWN POINT PHARMACY, CALLAS voluntarily surrendered DEA Registration Number BC9050511. Prior to surrendering the registration, CALLAS admitted

to agents of the DEA that CROWN POINT PHARMACY had been filling internet-issued

prescriptions. While CALLAS was in the process of signing the DEA Form 104,

surrendering the DEA registration of CROWN POINT PHARMACY, he remarked, "Oh

well, it's the nature of the beast." When asked by DEA personnel if he was aware individuals

had overdosed from controlled substances obtained via the internet, CALLAS replied, "it

happens."

13. On behalf of SKY RIDGE PHARMACY, ESKANOS voluntarily surrendered DEA

Registration Number BS8460709. ESKANOS admitted to DEA investigators that SKY

RIDGE PHARMACY filled 100 to 120 controlled substance prescriptions per day which

were generated from internet websites for a number of months. ESKANOS acknowledged he

did not verify the legitimacy of the doctor/patient relationship before filling the prescriptions.

14. On May 14, 2006, a Memorandum of Agreement (MOA) was reached between the DEA and

SKY RIDGE PHARMACY. The MOA was signed by both ESKANOS and CALLAS as

owners of SKY RIDGE PHARMACY. In the MOA, SKY RIDGE PHARMACY agreed to

abide by all Federal, state, and local laws and regulations relating to controlled substances

and to dispense controlled substance prescriptions only when the prescriptions are issued for

a legitimate medical purpose by an individual practitioner acting in the usual course of his or

her professional practice, as required by Title 21, United States Code, Sections 829, 842, 843,

and Title 21, Code of Federal Regulations, Section 1306.04(a).

15. On May 30, 2006, SKY RIDGE PHARMACY was granted a new DEA Registration Number

as a retail pharmacy: BS9770404. The registration was last renewed on January 19, 2015.

The expiration date of the registration is February 28, 2018. The e-signature on the

registration is Scott A Eskanos. The contact name associated with the registration is Scott

Eskanos. According to the Colorado Department of Regulatory Agencies (DORA) licensing website (www.colorado.gov/dora/licensing/Lookup), as of April 6, 2016, ESKANOS is listed as the Supervisor of SKY RIDGE PHARMACY with a start date of August 27, 2005.

16. On June 19, 2006, a MOA was reached between CROWN POINT PHARMACY and the DEA. The MOA was signed by both CALLAS and ESKANOS as owners of CROWN POINT PHARMACY. On June 23, 2006, your Affiant and DI Ricardo Quintero traveled to CROWN POINT PHARMACY and met with CALLAS regarding CROWN POINT PHARMACY's application for a new DEA registration. DI Quintero reviewed the MOA with CALLAS. DI Quintero explained to CALLAS that internet prescriptions could not be filled without a proper doctor/patient relationship. CALLAS stated he understood the MOA and would follow all terms as listed. CALLAS further stated CROWN POINT PHARMACY would abide by all Federal regulations.

17. On June 30, 2006, the DEA approved CROWN POINT PHARMACY's application for a new registration as a retail pharmacy and issued DEA Registration Number BC9838004. The registration was last renewed on August 31, 2015. The registration is due to expire on August 31, 2018.

18. The day to day operations of CROWN POINT PHARMACY are handled primarily by CALLAS.

19. The day to day operations of SKY RIDGE PHARMACY are handled primarily by ESKANOS.

20. SKY RIDGE COMPOUNDING PHARMACY was granted DEA Registration Number BS8460711 on August 25, 2003, as a retail pharmacy. The registration was last renewed on February 24, 2015. The registration is due to expire on February 28, 2018. According to

information received by your Affiant, SKY RIDGE COMPOUNDING PHARMACY is

owned by CALLAS. SKY RIDGE PHARMACY COMPOUNDING PHARMACY is

located at the same address as SKY RIDGE PHARMACY, however, SKY RIDGE

PHARMACY is located in Suite A while SKY RIDGE COMPOUNDING PHARMACY is

located in Suite B.

## SUMMARY OF INVESTIGATION

21. John Alan LITTLEFORD, DO was registered with the DEA from January 1, 1990 until

November 13, 2012, when he voluntarily surrendered his DEA registration. LITTLEFORD

owned and operated the Pain & Injury Clinic, which was once located at 10450 S. Progress

Way, Bldg A-105, Parker, Colorado, and later moved to 10371 S. Parkglenn Way, Suite 230,

Parker, Colorado. LITTLEFORD's DEA Registration Number was AL5599937.

22. On or about February 24, 2012, the DEA received reports from the Parker Police Department

in Parker, Colorado, related to LITTLEFORD. The reports indicated possible overprescribing

of narcotics by LITTLEFORD, including a serious motor vehicle accident caused by one of

LITTLEFORD's patients, while under the influence of prescription narcotics. Additional

information in the reports appeared suspicious. For example, LITTLEFORD personally

reported to Parker Police Department he had to go to Costa Rica to "get some money for his

divorce." LITTLEFORD also reported that Dr. Scott RUSSELL, DO worked in his office

and wrote prescriptions under LITTLEFORD's DEA registration number because RUSSELL

did not have a DEA registration "yet."

23. Additional investigation into RUSSELL revealed that, on July 30, 2002, RUSSELL's state

medical license had been restricted so that he could no longer prescribe, distribute, and

possess any scheduled substances. Those restrictions involving his state medical license were not permanent. RUSSELL voluntarily surrendered his DEA registration on December 2, 2002. On March 12, 2009, RUSSELL was issued a restricted state of Colorado medical license, but he was not allowed to prescribe or dispense any narcotics to any patient for any reason.

24. According to DORA, the Colorado Prescription Drug Monitoring Program (PDMP) provides a secure database of controlled substance prescriptions that have been dispensed by registered Colorado pharmacies. Your Affiant has acquired information from this system via validly issued Administrative Subpoenas.

25. A review of the PDMP report for LITTLEFORD indicated RUSSELL was filling narcotic prescriptions at multiple pharmacies, including CROWN POINT PHARMACY. For those prescriptions filled by RUSSELL at CROWN POINT PHARMACY, LITTLEFORD is listed as the prescribing doctor. RUSSELL filled large quantity prescriptions such as 600 Methadone tablets, among other medications. On or about March 28, 2012, the DEA was contacted by the Aurora Police Department in Aurora, Colorado, and informed that RUSSELL had committed suicide by gun shot.

26. During the month of March 2012, the DEA was also notified of the death of Kimberly MCMILLAN. A review of MCMILLAN's autopsy report and supplemental documents indicated that MCMILLAN died on September 1, 2011. The coroner's opinion was: "Death is due to complications of acute oxycodone and diazepam toxicity. The presence of acute pneumonia and central necrosis of the liver suggest a prolonged period of unconsciousness prior to death. This suggests also that levels of the drugs may have been initially higher, but had time to metabolize."

27. A PDMP report detailing all controlled substance prescriptions filled by MCMILLAN at Colorado pharmacies from March 18, 2011 to the last record of August 29, 2011, indicated that 15 out of 16 of MCMILLAN's prescriptions were filled at CROWN POINT PHARMACY.

| DATE FILLED | DOCTOR | DRUG | QTY | PHARMACY |
|---|---|---|---|---|
| 3/18/2011 | BENOIST | Oxycodone 30mg | 300 | CROWN POINT |
| 3/18/2011 | BENOIST | Diazepam 5mg | 135 | CROWN POINT |
| 3/18/2011 | BENOIST | Diazepam 5mg | 135 | CROWN POINT |
| 4/12/2011 | BENOIST | Diazepam 5mg | 135 | CROWN POINT |
| 4/16/2011 | BENOIST | Oxycodone 15mg | 480 | King Soopers |
| 5/11/2011 | MONTGOMERY | Oxycodone 30mg | 240 | CROWN POINT |
| 5/20/2011 | BENOIST | Diazepam 5mg | 135 | CROWN POINT |
| 6/7/2011 | BENOIST | Diazepam 5mg | 67 | CROWN POINT |
| 6/7/2011 | MONTGOMERY | Oxycodone 30mg | 240 | CROWN POINT |
| 6/16/2011 | BENOIST | Diazepam 5mg | 67 | CROWN POINT |
| 7/5/2011 | MONTGOMERY | Oxycodone 30mg | 240 | CROWN POINT |
| 7/5/2011 | MONTGOMERY | Diazepam 5mg | 90 | CROWN POINT |
| 8/2/2011 | MONTGOMERY | Oxycodone 30mg | 240 | CROWN POINT |
| 8/2/2011 | MONTGOMERY | Diazepam 5mg | 90 | CROWN POINT |
| 8/29/2011 | LITTLEFORD | Oxycodone 30mg | 120 | CROWN POINT |
| 8/29/2011 | LITTLEFORD | Diazepam 5mg | 90 | CROWN POINT |

28. On March 26, 2012, Parker Police Department provided DEA with documentation related to the suspected suicide death of John BRADSHAW. Prescription records indicated that during the time period of approximately one month before BRADSHAW's death (November 22, 2011 to December 20, 2011), LITTLEFORD prescribed BRADSHAW approximately 2,364 total dosage units of controlled substances—an average of approximately 80 dosage units/pills per day. All but one of these prescriptions was filled at CROWN POINT PHARMACY.

29. On August 16, 2012, your Affiant and DI Quintero visited CROWN POINT PHARMACY and spoke with Stacey LELAND, Pharmacy Technician. LELAND has been identified as the

daughter of Stanley CALLAS. CALLAS was not at the pharmacy during the visit by your Affiant and DI Quintero. LELAND reported CROWN POINT PHARMACY filled many prescriptions written by LITTLEFORD. According to LELAND, the prescriptions were often for Oxycodone 30mg and often in large quantities, up to 600 dosage units. According to LELAND, LITTLEFORD's office would often fax a copy of the patient's prescription to the pharmacy before the patient actually came to the pharmacy with the prescription in hand. LELAND stated when the pharmacy called LITTLEFORD's office to verify a prescription they were always told the prescription was legitimate. LELAND reported a number of CROWN POINT PHARMACY patients who were receiving prescriptions from LITTLEFORD had committed suicide. LELAND had no details of the circumstances of the suicides. According to LELAND, patients BRADSHAW, RUSSELL, Richard CARBONE, and John PLATO were all patients of LITTLEFORD who filled prescriptions at CROWN POINT PHARMACY and all of them committed suicide. LELAND did not provide information on if these individuals filled prescriptions at other pharmacies.

30. On September 19, 2012, the DEA Denver Tactical Diversion Squad (TDS) conducted an undercover operation at LITTLEFORD's office located at 10371 S. Parkglenn Way, Suite #230, Parker, Colorado. During the operation, an agent working in an undercover capacity acquired 90 dosage units of Oxycodone 15mg and 30 dosage units of Diazepam 10mg from prescriptions written by LITTLEFORD.

31. LITTLEFORD's exam of the undercover agent was limited. LITTLEFORD discussed with the undercover agent LITTLEFORD's preference for women from countries other than the United States due to their more liberal attitude about sex. After receiving the written prescriptions, the undercover agent asked LITTLEFORD where he could get them filled.

LITTLEFORD described the location of CROWN POINT PHARMACY and suggested the undercover agent fill the prescriptions there because, "they like me there; they're not gonna hassle you."

32. DEA consulted with a medical expert with training and experience related to alcohol and drug addiction. In the expert's opinion, after reviewing the patient file for the DEA agent acting in an undercover capacity, the expert opined that LITTLEFORD's controlled substance prescribing was without a legitimate medical purpose and it placed the patient at unnecessary risk of drug overdose and the development of addiction. DEA agents filled the prescriptions written by LITTLEFORD at CROWN POINT PHARMACY. The agents noticed no one at the pharmacy called to verify the prescriptions.

33. On October 1, 2012, the DEA Denver TDS conducted another undercover operation at LITTLEFORD's office. During the operation, the undercover DEA agent acquired a written prescription for 90 dosage units (du) of Oxycodone 15mg tablets written by LITTLEFORD. On October 1, 2012, a DEA undercover agent presented the prescription to ESKANOS at SKY RIDGE PHARMACY. ESKANOS filled the prescription written by LITTLEFORD and did not call to verify the prescription.

34. On October 2, 2012, Joel KENNEDY, a 34-year-old man from Brighton, Colorado, died as a result of Oxycodone toxicity. The Adams and Broomfield Coroner report documented the manner of death was accidental. KENNEDY filled prescriptions issued by LITTLEFORD for large quantities of Oxycodone 30mg at SKY RIDGE PHARMACY. According to a dispensing report obtained at SKY RIDGE PHARMACY on April 11, 2013, KENNEDY's documented address was 2900 Porcell Street E5, Brighton, Colorado 80101—approximately 43 miles from SKY RIDGE PHARMACY. The dispensing report identified prescriptions

authorized by LITTLEFORD and dispensed at SKY RIDGE PHARMACY between the dates of January 1, 2009 and April 11, 2013. This report revealed KENNEDY received seven separate prescriptions for 840 Oxycodone 30mg tablets with the instruction of, "take 6 tablets by mouth every 4 hours as needed for pain." The following table lists the prescriptions by date, along with the initials of the pharmacist who filled each prescription:

| Date | Prescriber | Controlled Substance | Quantity | Pharmacist Initials |
|------|-----------|---------------------|----------|---------------------|
| 4/4/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SGC |
| 4/30/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SGC |
| 5/23/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SAE |
| 6/18/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SAE |
| 7/16/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SAE |
| 8/14/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SAE |
| 9/12/12 | LITTLEFORD | Oxycodone 30mg. | 840 du | SAE |

(NOTE: Investigation revealed the pharmacist initials of SGC are those of Stanley G. CALLAS and SAE are the initials of Scott Alan ESKANOS.)

35. On October 4, 2012, your Affiant received a phone call from CALLAS. CALLAS reported that Dianna SMITHLING, the Office Manager of LITTLEFORD's medical practice, had brought in a prescription for a large amount of injectable Meperidine (a schedule II controlled substance also known as Demerol). CALLAS explained the prescription was for a three month supply as SMITHLING was moving to California and a three month supply would allow her time to find a doctor. CALLAS then reported SMITHLING would be returning every two weeks to work in LITTLEFORD's medical office.

36. Your Affiant cautioned CALLAS that pharmacists have a corresponding liability with the practitioner to make sure any prescription is legitimate. CALLAS stated he knew the prescription had been legitimately written by a doctor, but he was not sure if the prescription

was written for a legitimate cause. Your Affiant again reminded CALLAS of his corresponding liability as a pharmacist.

37. Benjamin PACKER of Castle Rock, Colorado, died on October 7, 2012. According to the Douglas County Coroner autopsy and toxicology report, the cause of death was complications of acute Oxycodone toxicity; with the manner of death as suicide. The forensic urinary toxicology analysis tested positive for benzodiazepines, opiates, and oxycodone. PACKER was a patient of LITTLEFORD and filled numerous prescriptions at SKY RIDGE PHARMACY. Dispensing records from SKY RIDGE PHARMACY obtained on April 11, 2013, revealed SKY RIDGE PHARMACY dispensed the following controlled substances to PACKER:

| Date | Prescriber | Controlled Substance | Quantity | Pharmacist Initials |
|---|---|---|---|---|
| 5/17/2012 | LITTLEFORD | Morphine Sul 30mg | 90 du | SAE |
| 5/17/2012 | LITTLEFORD | Oxycodone 30mg. | 180 du | SAE |
| 6/15/2012 | LITTLEFORD | Oxycontin 40mg | 30 du | SAE |
| 6/15/2012 | LITTLEFORD | Oxycodone 30mg. | 180 du | SAE |
| 6/15/2012 | LITTLEFORD | Diazepam 10mg | 60 du | SAE |
| 6/29/201 | LITTLEFORD | Oxycodone 30mg. | 90 du | SAE |
| 6/29/2015 | LITTLEFORD | Fentanyl 75mcg | 5 patches | SAE |
| 7/3/2012 | LITTLEFORD | Oxycodone 30mg | 90 du | SAE |
| 7/10/2012 | LITTLEFORD | Oxycodone 30mg | 300 du | SAE |
| 7/10/2012 | LITTLEFORD | Diazepam 10mg | 60 du | SAE |
| 8/7/2012 | LITTLEFORD | Oxycodone 30mg | 300 du | SAE |
| 9/7/2012 | LITTLEFORD | Oxycodone 30mg | 300 du | SAE |
| 10/4/2012 | LITTLEFORD | Oxycodone 30mg | 300 du | HJJ |
| 10/4/2012 | LITTLEFORD | Fentora 200mcg | 10 patches | HJJ |

(NOTE: Investigation revealed SAE are the initials of Scott ESKANOS and HJJ are the initials of Heather JORGENSEN.)

38. As noted in the chart above, between June 29, 2012 and July 10, 2012 (approximately a twelve day period), PACKER filled three different prescriptions for Oxycodone 30mg, for a total of 480 dosage units. In the same time frame, PACKER received 5 patches of Fentanyl

13

75mcg and 60 dosage units of Diazepam 10mg. According to SKY RIDGE PHARMACY's

records, these prescriptions were all issued by LITTLEFORD and dispensed by ESKANOS.

39. On October 16, 2012 and October 17, 2012, the DEA Denver TDS conducted another

undercover operation at LITTLEFORD's office. During the operation, the DEA agent acting

in an undercover capacity received a prescription written by LITTLEFORD for 150 dosage

units of oxycodone 30mg. On October 19, 2012, the undercover agent filled the prescription

at SKY RIDGE PHARMACY. ESKANOS asked the undercover agent if he knew

LITTLEFORD doubled the prescription from the previous prescription of October 1, 2012.

The undercover agent stated "yes." ESKANOS then dispensed the prescription written by

LITTLEFORD. The undercover agent noticed ESKANOS did not call LITTLEFORD's

office to verify the prescription.

40. On October 31, 2012, the Colorado Medical Board voted to summarily suspend

LITTLEFORD's medical license, effective November 5, 2012. The Panel alleged, among

other allegations, that in 2011 and 2012 LITTLEFORD prescribed controlled substances to

patients in amounts that exceeded generally accepted medical standards for patients'

documented injuries.

41. On November 9, 2012, DIs Shane Pitts and Heather Achbach, along with and Group

Supervisor (GS) John Cohen met with LITTLEFORD to request a voluntary surrender of his

DEA Registration because LITTLEFORD no longer had a valid state medical license, which

is a prerequisite for having a DEA registration. LITTLEFORD voluntarily surrendered his

DEA registration. During the conversation, LITTLEFORD said he had patients from Fort

Collins to Pueblo, Colorado. Some of those patients found him online, while other patients

came from doctors who would no longer prescribe for them. LITTLEFORD estimated that 80

14

percent of his practice is pain patients on pain medicines. LITTLEFORD does not currently have a state medical license in the State of Colorado and does not have a DEA registration.

42. On December 6, 2012, DEA Special Agent Tyler Brown and Intelligence Research Specialist Kyle McGee conducted a consensual interview of Mariesha DERKEVORKIAN. DERKEVORKIAN said she worked in LITTLEFORD's office from May 2012 to November 2012 as an office assistant. DERKEVORKIAN stated she was interviewed and hired by SMITHLING in May 2012. SMITHLING was the office manager. According to DERKEVORKIAN, SMITHLING posted a letter in the office telling patients to avoid filling prescriptions at the Walgreens located at the corner of Parker and Lincoln. SMITHLING suggested patients use CROWN POINT PHARMACY or SKY RIDGE PHARMACY to fill prescriptions. DERKEVORKIAN said CROWN POINT PHARMACY and SKY RIDGE PHARMACY were the preferred pharmacies and these pharmacies rarely called to question prescriptions. CALLAS and his family came to the open house for LITTLEFORD's new office in the Parker Medical Center. During a lunch meeting with LITTLEFORD after he lost his medical license, DERKEVORKIAN learned that, after LITTLEFORD's office was closed, LITTLEFORD visited CALLAS at the pharmacy on a weekly basis.

43. On April 11, 2013, your Affiant and GS Cohen obtained dispensing reports via DEA Form 82, Notice of Inspection from CROWN POINT PHARMACY in relation to an investigation involving LITTLEFORD. Investigative efforts have uncovered five deceased patients (including the individuals mentioned earlier in this report) who filled a majority of their prescriptions at CROWN POINT PHARMACY. The patients filled prescriptions mainly for narcotics. The deceased are as follows:

    a.  Kimberly MCMILLAN (Date of Death 9/1/2011);

15

    b.  John BRADSHAW (Date of Death: 12/27/2011);

    c.  Richard CARBONE (Date of Death 6/2/2012);

    d.  Scott RUSSEL (1/2/2012); and

    e.  John PLATO (Date of Death 8/3/2012).

44. The prescriptions detailed below were written by LITTLEFORD and filled at CROWN

    POINT PHARMACY (all totals are approximate):

    a.  MCMILLAN received approximately 120 dosage units of Oxycodone and 90

        dosage units of Diazepam on August 29, 2011.

    b.  BRADSHAW received approximately 17,564 dosage units of primarily narcotics

        from March 2, 2011 to December 20, 2011.

    c.  CARBONE received approximately 5,610 dosage units of primarily narcotics

        from July 27, 2011 to May 18, 2012.

    d.  PLATO received approximately 2,300 narcotics from October 21, 2011 to July 2,

        2012.

    e.  RUSSELL received approximately 3,210 dosage units of primarily narcotics.

    f.  SMITHLING, referenced earlier, is still alive. SMITHLING received

        approximately 11,451 dosage units of primarily narcotics from August 1, 2011 to

        November 5, 2012.

45. On April 11, 2013, your Affiant and GS Cohen went to SKY RIDGE PHARMACY and

    identified themselves to ESKANOS. Your Affiant presented ESKANOS with a DEA Form

    82, Notice of Inspection, which ESKANOS reviewed and signed. Your Affiant and GS

    Cohen obtained a controlled substance prescription dispensing profile from SKY RIDGE

    PHARMACY which detailed every prescription written by LITTLEFORD between the dates

of January 1, 2009 and April 11, 2013. This profile revealed approximately 198 prescriptions were written by LITTLEFORD and filled at SKY RIDGE PHARMACY. The majority of the prescriptions were filled from March 2012 to November 2012.  On the date of the administrative inspection, ESKANOS indicated he was aware LITTLEFORD was no longer allowed to write prescriptions.

46. Your Affiant and GS Cohen also obtained a patient profile for Mark DIGRAPPA on April 11, 2013, from SKY RIDGE PHARMACY. This patient profile documented all controlled substance prescriptions filled by DIGRAPPA at SKY RIDGE PHARMACY between April 1, 2012, and April 11, 2013. In total, DIGRAPPA filled approximately 56 controlled substance prescriptions. The report revealed on October 6, 2012, DIGRAPPA filled a prescription for 540 dosage units of Oxycodone 30mg tablets. The prescription was written by Dr. Jonathan Clapp, Colorado Comprehensive Spine Institute, 3277 Lincoln Street, Englewood, Colorado 80113, DEA Registration Number FC1276523. On October 23, 2012, DIGRAPPA filled a prescription for 540 dosage units of Oxycodone 30mg tablets authorized by Dr. Clapp. On October 30, 2013, DIGRAPPA filled a prescription for 1,620 dosage units of Oxycodone 30mg tablets authorized by Dr. Clapp. In October 2012, DIGRAPPA filled three prescriptions for Oxycodone 30mg tablets at SKY RIDGE PHARMACY and received a total of 2,700 dosage units of Oxycodone 30mg listed as authorized by Dr. Clapp. Your Affiant asked ESKANOS about the prescription filled for 1,620 tablets of Oxycodone 30mg, ESKANOS stated DIGRAPPA was in midst of a divorce and was no longer going to be on his wife's insurance, so to provide him a three month supply of Oxycodone while he was still on the insurance, the prescription for 1,620 tablets of Oxycodone 30mg was dispensed. ESKANOS provided a copy of the prescription. The prescription itself states the prescription

is for a 3-month supply. DIGRAPPA did not fill any prescriptions at SKY RIDGE PHARMACY in November 2012. In December of 2012, DIGRAPPA filled a prescription for 60 dosage units of Oxycodone 30mg which was prescribed by Paige Corbett, NP, 7280 Lagae Road #J, Castle Pines, DEA Registration Number MC1973280. On December 18, 2012, DIGRAPPA filled a prescription for 750 dosage units of Oxycodone 30mg written by Dmitriy Pales, DO, 8401 S. Chambers Road #101, Parker, CO 80134, DEA Registration Number BP7331919. Thus, in December 2012, DIGRAPPA filled two separate prescriptions at SKY RIDGE PHARMACY for a total of 810 dosage units of Oxycodone 30mg tablets. DIGRAPPA received the 810 dosage units of Oxycodone 30mg in December 2012, despite the fact the prescription for 1,620 dosage units of Oxycodone which was filled on October 30, 2012, was for a three month supply. All of these prescriptions filled at SKY RIDGE PHARMACY were dispensed by ESKANOS.

47. During the discussion on April 11, 2013, ESKANOS stated he had filled prescriptions written by LITTLEFORD for Dianna SMITHLING, the office manager for LITTLEFORD. ESKANOS claimed he reviewed SMITHLING's PDMP report and observed SMITHLING filled prescriptions at a number of pharmacies. ESKANOS said he asked SMITHLING why she went to various pharmacies and SMITHLING responded it was because sometimes pharmacies would not have the correct medication so she ended up using a variety of pharmacies. ESKANOS stated he never spoke to LITTLEFORD when he would call to verify prescriptions which were purported to have been written by LITTLEFORD. Whenever he called LITTLEFORD's office, SMITHLING appeared to be the person verifying the prescriptions, even if the prescriptions were written for SMITHLING. The following

18

controlled substance prescriptions written by LITTLEFORD were filled for SMITHLING at

SKY RIDGE PHARMACY:

| Write Date | Fill Date | QTY | Controlled Substance | RPh |
|---|---|---|---|---|
| 2/7/2012 | 2/7/2012 | 24 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 2/20/2012 | 2/20/2012 | 450 | MORPHINE SULFATE IR 30 MG TAB | SGC |
| 2/20/2012 | 2/20/2012 | 120 | MORPHINE SULF ER 100 MG TABLET | SGC |
| 2/20/2012 | 2/20/2012 | 90 | MORPHINE SULF ER 60 MG TABLET | SGC |
| 2/20/2012 | 2/20/2012 | 30 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 2/27/2012 | 2/27/2012 | 24 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/2/2012 | 3/2/2012 | 500 | MORPHINE SULFATE IR 30 MG TAB | SGC |
| 3/2/2012 | 3/2/2012 | 150 | MORPHINE SULF ER 100 MG TABLET | SGC |
| 3/2/2012 | 3/2/2012 | 10 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/4/2012 | 3/4/2012 | 10 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/2/2012 | 3/4/2012 | 10 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/19/2012 | 3/19/2012 | 50 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/26/2012 | 3/26/2012 | 500 | MORPHINE SULFATE IR 30 MG TAB | SGC |
| 3/26/2012 | 3/26/2012 | 150 | MORPHINE SULF ER 100 MG TABLET | SGC |
| 3/29/2012 | 3/29/2012 | 70 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 3/26/2012 | 3/30/2012 | 30 | LORAZEPAM 1 MG TABLET | SGC |
| 4/3/2012 | 4/3/2012 | 180 | MORPHINE SULF ER 60 MG TABLET | SGC |
| 4/6/2012 | 4/6/2012 | 240 | ENDOCET 10- 325 MG TABLET | SGC |
| 4/6/2012 | 4/6/2012 | 24 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 4/13/2012 | 4/13/2012 | 450 | MORPHINE SULFATE IR 30 MG TAB | SGC |
| 4/13/2012 | 4/13/2012 | 120 | MORPHINE SULF ER 100 MG TABLET | SGC |
| 4/13/2012 | 4/13/2012 | 90 | MORPHINE SULF ER 60 MG TABLET | SGC |
| 4/17/2012 | 4/17/2012 | 45 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 5/1/2012 | 5/1/2012 | 70 | MEPERIDINE 100 MG/ ML VIAL | SGC |
| 5/10/2012 | 5/10/2012 | 500 | MORPHINE SULFATE IR 30 MG TAB | SAE |
| 5/10/2012 | 5/10/2012 | 120 | MORPHINE SULF ER 100 MG TABLET | SAE |
| 5/10/2012 | 5/10/2012 | 90 | MORPHINE SULF ER 60 MG TABLET | SAE |
| 6/14/2012 | 6/15/2012 | 450 | MORPHINE SULFATE IR 30 MG TAB | SAE |
| 6/15/2012 | 6/15/2012 | 150 | MORPHINE SULF ER 100 MG TABLET | SAE |
| 6/14/2012 | 6/15/2012 | 45 | MEPERIDINE 100 MG/ ML VIAL | SAE |
| 7/26/2012 | 7/26/2012 | 500 | MORPHINE SULFATE IR 30 MG TAB | SAE |
| 7/26/2012 | 7/26/2012 | 240 | MORPHINE SULF ER 60 MG TABLET | SAE |
| 7/26/2012 | 7/26/2012 | 120 | MORPHINE SULF ER 100 MG TABLET | SAE |

48. The PDMP and dispensing records from CROWN POINT PHARMACY reveal that, on

September 13, 2012, SMITHLING filled 30 Morphine Sulfate 100mg tablets, 450 Morphine

Sulfate 60mg tablets, 1500 Morphine Sulfate 30mg tablets, 180 Meperidine 100mg/ml vials, and 270 Lorazepam 2mg tablets. CALLAS was the pharmacist who dispensed all of those prescriptions except the 30 Morphine Sulfate 100mg tablets which were filled by another pharmacist at CROWN POINT PHARMACY. All of those prescriptions were supposedly for a 90-day supply. However, on November 5, 2012, just 53 days later, SMITHLING filled 180 Morphine Sulfate 200mg tablets and 400 Morphine Sulfate 30mg tablets with CALLAS at CROWN POINT PHARMACY.

49. On June 17, 2013, your Affiant received a phone call from CALLAS. CALLAS reported that an individual named Jeffrey ROBINSON was receiving prescriptions for Oxycodone 30mg from a Dr. SCHNEIDER. The prescriptions were weekly and were for 360 tablets of Oxycodone 30mg. CALLAS noted ROBINSON had filled three prescriptions of 360 dosage units of Oxycodone 30mg at CROWN POINT PHARMACY. CALLAS opined if ROBINSON was taking that amount, ". . . he would not be standing." CALLAS also stated he speculated ROBINSON must be selling some of the Oxycodone 30mg dosage units. CALLAS stated the directions from the doctor indicated ROBINSON should take 3 tablets every 4 hours. CALLAS noted if ROBINSON was following the directions of the prescriptions each prescription should last 20 days not 7 days.

50. CALLAS stated CROWN POINT PHARMACY had filled the 360 dosage units of Oxycodone 30mg for ROBINSON on 5/31/13, 6/7/13, and 6/17/13. CALLAS noted part of the prescription filled on 6/17/13 was filled on 6/14/2013 and the remainder of the prescription was filled on 6/17/2013. CALLAS indicated he had run a PDMP report on ROBINSON and that since January 1, 2013, ROBINSON had received 9,000 dosage units of Oxycodone 30mg. CALLAS noted ROBINSON had used various pharmacies to fill his

Oxycodone prescriptions. CALLAS stated his pharmacy has called SCHNEIDER's office

each time ROBINSON has brought in a prescription for the 360 dosage units of Oxycodone

30mg into CROWN POINT PHARMACY. Each time the pharmacy had called the doctor's

office they had spoken to an Andrea (LNU) who stated the prescription is legitimate.

CALLAS did not know Andrea's name or job tile. Your Affiant reminded CALLAS of the

corresponding liability for a pharmacist when filling prescriptions and that he could choose

to deny filling a prescription if he did not think the prescription was legitimate. On May 21,

2015, SCHNEIDER permanently relinquished his Colorado medical license prior to a formal

disciplinary hearing with the Colorado Medical Board. The Colorado Medical Board alleged:

> Between November 2012 and November 2013, Respondent prescribed
> excessive amounts of controlled substances to Patients 1 through 4.
> Respondent's prescribing of pain medications to these four patients
> exceeded amounts indicated by examination findings and Respondent too
> often permitted early refills of the patients' controlled substance
> medications.

51. On July 3, 2014, DEA Special Agent Mike Tonozzi and Task Force Officer Jason DiManna

met with a Source of Information (hereafter, SOI) in order to conduct an interview related to

his knowledge of drug trafficking activity. The SOI admitted SOI abused prescription

medications. The SOI eventually started buying from approximately four sources of supply.

The SOI stated 3 out of 4 of the sources were getting Oxycodone from LITTLEFORD. The

SOI knew this because the prescription bottles the SOI observed had LITTLEFORD's name

on the label. In addition, the SOI used to drive one of the SOI sources of supply to

LITTLEFORD' s medical practice approximately every two weeks to obtain narcotics. The

SOI became  a patient of  LITTLEFORD.  SOI was directed by LITTLEFORD's office to fill

SOI's prescriptions at CROWN POINT PHARMACY.

52. On November 10, 2015, your Affiant and Special Agent Brown went to the home of pharmacist Jerry SHELTON. Since retiring from Merck & Co Inc., SHELTON stated he has worked as a fill-in pharmacist for CALLAS. SHELTON described CALLAS as being a friend and well respected in the pharmacy community. SHELTON further described CALLAS as one of the most ethical individuals he knows. SHELTON informed your Affiant and Special Agent Brown he fills in for CALLAS at CROWN POINT PHARMACY when CALLAS calls and asks him to fill-in. SHELTON has only filled in for CALLAS and no other pharmacist. SHELTON considers it somewhat of a favor to fill-in when CALLAS calls him. SHELTON could not recall the exact dates he has worked at CROWN POINT PHARMACY, but indicated it has been very limited and thought he may not have worked at all in 2014. SHELTON has not worked at any other pharmacy as a part-time employee besides CROWN POINT PHARMACY, but does do some consulting work within the pharmaceutical industry.

53. SHELTON recalled, while working at CROWN POINT PHARMACY, receiving prescriptions which were written by LITTLEFORD. SHELTON described LITTLEFORD as the one doctor whose prescriptions had raised "red flags" while working at CROWN POINT PHARMACY. According to SHELTON, he did not question the legality of the prescriptions in the sense he was confident the prescriptions were written by LITTLEFORD, but he was concerned with the prescriptions because of other reasons. SHELTON stated he was concerned with the prescriptions based on the high quantities of opioids prescribed, the fact that many of the patients with LITTLEFORD prescriptions were of a younger age, and the patients often showed up near closing time with the prescriptions. SHELTON recalled the majority of LITTLEFORD's prescriptions would list the diagnosis of the patient as being

severe pain, back pain, or lumbar pain. SHELTON specifically recalled none of the

prescriptions were for cancer patients. SHELTON remembered patients (names unrecalled)

who appeared to be bodybuilders, but were receiving testosterone. Due to his concerns about

LITTLEFORD, SHELTON "googled" LITTLEFORD to learn more about LITTLEFORD.

SHELTON said this is the only time he has ever "googled" a doctor.

54. SHELTON revealed he would generally feel uncomfortable calling a doctor about a

prescription. SHELTON stated he never called LITTLEFORD concerning the prescriptions

for which he had concerns, but he did take his concerns about prescriptions to CALLAS who

assured him the prescriptions were fine and could be filled. In fact, SHELTON actually

presented LITTLEFORD prescriptions to CALLAS. SHELTON believed it was sometime in

2010 or 2011 when he discussed the LITTLEFORD prescriptions with CALLAS. CALLAS

indicated to SHELTON that CALLAS had met with LITTLEFORD in person and

LITTLEFORD's prescriptions were fine. SHELTON stated once he discussed the

LITTLEFORD prescriptions with CALLAS he felt comfortable filling the prescriptions

based on the fact CALLAS assured him the prescriptions were fine and he trusted

CALLAS's judgment. Further, when reviewing various patient histories he noted similar

LITTLEFORD prescriptions had been filled for the patients a number of times at CROWN

POINT PHARMACY and SHELTON was merely following what had previously been done

at the pharmacy. When asked by Special Agent Brown if he would have filled the

prescriptions for which he had questions if he was the owner of the pharmacy, SHELTON

admitted, ". . . no, I would not have filled the prescriptions if I owned the pharmacy."

SHELTON recalled the pharmacy technicians at CROWN POINT PHARMACY voicing

their concerns regarding LITTLEFORD prescriptions, yet the prescriptions were still filled.

55. SHELTON could not recall the exact date, but stated approximately a year ago he was filling in at the pharmacy when pharmacy technician Lisa CALLAS informed him LITTLEFORD had gotten into some sort of trouble and was no longer practicing. SHELTON stated he was unaware of exactly what type of trouble LITTLEFORD got into and why he could not practice. SHELTON stated the technicians appeared relieved when LITTLEFORD was no longer writing prescriptions. SHELTON himself was also relieved when LITTLEFORD prescriptions were no longer being filled at the pharmacy. In fact, SHELTON stated he feels better working at the pharmacy now that the LITTLEFORD prescriptions are no longer filled at the pharmacy. SHELTON was actually considering not working at the pharmacy any longer as he did not want to deal with the LITTLEFORD prescriptions, but he reiterated he trusted CALLAS's judgment.

56. SHELTON was aware that Dianna SMITHLING, the office manager of LITTLEFORD's medical practice referred patients to CROWN POINT PHARMACY. When asked if he was aware SMITHLING filled her personal prescriptions at the pharmacy, SHELTON stated he was unaware SMITHLING filled her prescriptions at the pharmacy. SHELTON indicated it would have been a problem if he knew SMIHTLING was filling her own prescriptions at the pharmacy and also referring patients to the pharmacy.

57. SHELTON described CALLAS as, "being married" to CROWN POINT PHARMACY. SHELTON estimated CALLAS is the pharmacist in charge 90% of the time when CROWN POINT PHARMACY is open. According to SHELTON, only one pharmacist at a time works at CROWN POINT PHARMACY and there are not multiple pharmacists on a shift. SHELTON did recall he has been called by CALLAS to fill in for CALLAS and when SHELTON got to the pharmacy he was pharmacist in charge and the only pharmacist

24

working, but CALLAS would be in his office working on paperwork. SHELTON was never specifically trained regarding the use of the PDMP or counseling of patients. SHELTON did state the pharmacy has instituted one policy wherein they do not fill high quantity prescriptions: quantities over 180 dosage units. However, SHELTON recalled the pharmacy has filled quantities of 240 for Dr. Jean BOUQUET, 12919 Stroh Ranch Court #G, Parker, CO 80134, DEA registration number BB2375372.

58. An inquiry to the Colorado Board of Pharmacy on January 20, 2016 revealed that, between January 1, 2010 and January 28, 2016, neither CALLAS nor ESKANOS ever made an inquiry to the PDMP system concerning BRADSHAW, CARBONE, JOHNSON, KENNEDY, MCMILLAN, PACKER, PLATO, or SMITHLING. The inquiry did not note whether or not any inquiry was made concerning RUSSELL.

59. On December 3, 2015, your Affiant and Special Agent Brown visited SKY RIDGE PHARMACY. They informed the clerk they would like to speak to the manager of SKY RIDGE COMPOUNDING PHARMACY. ESKANOS then explained to your Affiant and Special Agent Brown that, "I have nothing to do with the compounding pharmacy; it is all Stan's."

60. Your Affiant and Special Agent Brown were escorted to Suite B: SKY RIDGE COMPOUNDING PHARMACY through SKY RIDGE PHARMACY, Suite A as both pharmacies shared a common entrance.   Heather JORGENSEN identified herself as the Pharmacist in Charge. Your Affiant presented JORGENSEN with a DEA 82, Notice of Inspection, which she reviewed and signed. JORGENSEN confirmed SKY RIDGE COMPOUNDING PHARMACY is owned by CALLAS and is a separate business from SKY RIDGE PHARMACY. JORGENSEN explained sales of SKY RIDGE

25

COMPOUNDING PHARMACY are rung up on the cash register of SKY RIDGE PHARMACY, but a certain button on the register is used to differentiate sales between SKY RIDGE COMPOUNDING PHARMACY and SKY RIDGE PHARMACY. JORGENSEN did explain SKY RIDGE COMPOUNDING PHARMACY was a cash only pharmacy.

61. Your Affiant and Special Agent Brown conducted an audit of two schedule II controlled substances: Hydromorphone and Oxycodone. No discrepancies were found with regard to the Hydromorphone. It was found that the pharmacy had record keeping violations concerning the Oxycodone. When questioned about the unaccounted for Oxycodone, JORGENSEN stated it was, "waste"  that occurred during the compounding  processing and sometimes "extras" are made during the compounding  process.   Your Affiant determined an amount of 24.75gr of Oxycodone could not be accounted for. 24.75gr of Oxycodone is enough oxycodone to make 825 Oxycodone 30mg tablets.

62. The Colorado Board of Pharmacy initiated a complaint against SKY RIDGE COMPOUNDING PHARMACY on August 12, 2010, as the pharmacy failed to comply with the data submission requirements of Colorado's PDMP. SKY RIDGE COMPOUNDING PHARMACY subsequently failed to submit the required data to the PDMP for the reporting period of February 16, 2011 through February 25, 2011. On March 19, 2011 SKY RIDGE COMPOUNDING PHARMACY admitted to these violations, entered into a Stipulation and Final Agency Order, and paid a fine of $5,000.00.

63. On April 7, 2016, your Affiant reviewed a PDMP profile of CALLAS. The PDMP profile reveals Schedule II controlled substance prescriptions for CALLAS have been filled at CROWN POINT PHARMACY during the last several years.  The chart below note prescriptions filled since January 2015:

| Date Dispensed | Quantity | Drug Name | Dispenser | Date Prescribed | Recipient Last Name | Recipient First Name |
|---|---|---|---|---|---|---|
| 2/24/2016 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 2/16/2016 | CALLAS | STAN |
| 2/24/2016 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 2/16/2016 | CALLAS | STAN |
| 1/14/2016 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 1/14/2016 | CALLAS | STAN |
| 1/14/2016 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 1/14/2016 | CALLAS | STAN |
| 1/14/2016 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 1/14/2016 | CALLAS | STAN |
| 12/10/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 12/8/2015 | CALLAS | STAN |
| 12/10/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 12/1/2015 | CALLAS | STAN |
| 11/19/2015 | 40 | OXYCODONE-ACETAMINOPHEN 5-325 | CROWN POINT PHARMACY | 11/19/2015 | CALLAS | STAN |
| 11/19/2015 | 40 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 11/19/2015 | CALLAS | STAN |
| 11/11/2015 | 40 | OXYCODONE-ACETAMINOPHEN 5-325 | CROWN POINT PHARMACY | 11/11/2015 | CALLAS | STAN |
| 10/21/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 10/13/2015 | CALLAS | STAN |
| 10/13/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 10/13/2015 | CALLAS | STAN |
| 10/13/2015 | 150 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 10/13/2015 | CALLAS | STAN |
| 9/11/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 8/31/2015 | CALLAS | STAN |
| 9/11/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 8/31/2015 | CALLAS | STAN |
| 7/14/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 7/13/2015 | CALLAS | STAN |
| 7/14/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 7/13/2015 | CALLAS | STAN |
| 7/14/2015 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 7/13/2015 | CALLAS | STAN |
| 6/11/2015 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 6/3/2015 | CALLAS | STAN |
| 5/31/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 5/19/2015 | CALLAS | STAN |
| 5/31/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 5/19/2015 | CALLAS | STAN |
| 4/13/2015 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 4/13/2015 | CALLAS | STAN |
| 4/13/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 4/13/2015 | CALLAS | STAN |
| 4/13/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 4/13/2015 | CALLAS | STAN |
| 3/5/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 2/25/2015 | CALLAS | STAN |

| 3/5/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 2/25/2015 | CALLAS | STAN |
|---|---|---|---|---|---|---|
| 3/5/2015 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 2/25/2015 | CALLAS | STAN |
| 1/19/2015 | 30 | ADDERALL XR 20 MG CAPSULE | CROWN POINT PHARMACY | 1/13/2015 | CALLAS | STAN |
| 1/19/2015 | 120 | HYDROMORPHONE 4 MG TABLET | CROWN POINT PHARMACY | 1/13/2015 | CALLAS | STAN |
| 1/19/2015 | 30 | ADDERALL XR 30 MG CAPSULE | CROWN POINT PHARMACY | 1/13/2015 | CALLAS | STAN |

## OWNERSHIP AND FINACIAL INFORMATION

64. CALLAS and ESKANOS are co-owners of CROWN POINT PHARMACY and SKY
RIDGE PHARMACY.  Each identified themselves to DEA as such when signing the
Memorandum of Agreement with DEA in 2006.  Additionally, public records and bank
account records also indicate and support an ownership interest in each pharmacy. CROWN
POINT PHARMACY is registered with the Colorado Secretary of State to Calesko, Inc.
ESKANOS is the Registered Agent of Calesko, Inc. SKY RIDGE PHARMACY is registered
with the Colorado Secretary of State to Listco, Inc. CALLAS is the Registered Agent of
Listco, Inc. CALLAS and ESKANOS are joint owners of a business checking account at
Guaranty Bank and Trust Company, in the name of CROWN POINT PHARMACY, Calesko
Inc., with an account number ending in 3853.  Analysis of this account showed that it was the
primary operating account of CROWN POINT PHARMACY which was used to deposit
business receipts and to make payments on behalf of CROWN POINT PHARMACY.  This
account was used by CROWN POINT PHARMACY to purchase controlled substances from
Cardinal Health. CALLAS and ESKANOS are joint owners of a business checking account
at Guaranty Bank and Trust Company, in the name of Listco Inc. d/b/a SKY RIDGE
PHARMACY, with an account number ending in 7056.  Analysis of this account showed that
it was the primary operating account of SKY RIDGE PHARMACY which used to deposit

28

business receipts and to make payments on behalf of SKY RIDGE PHARMACY.  This

account was used by SKY RIDGE PHARMACY to purchase controlled substances from

McKesson Drug. In addition to the two operating accounts of the pharmacies, there was a

third account identified that was associated to the pharmacies.  It was a business checking

account at Guaranty Bank and Trust Company, in the name of Josta Inc. d/b/a SKY RIDGE

PHARMACY, with an account number ending in 7064.  CALLAS and two others not

charged in the indictment are the owners of this business checking account; ESKANOS is not

listed on the account.  According to Secretary of State records, CALLAS is the registered

agent of Josta Inc. Analysis of the account showed that it was used as a repository account

into which the operating accounts of CROWN POINT PHARMACY (Guaranty Bank and

Trust Company account number ending 3853) and SKY RIDGE PHARMACY (Guaranty

Bank and Trust Company account number ending 7056) regularly transferred funds into.

The account funded payments to personal bank accounts of ESKANOS and CALLAS as well

as regular payments to a payroll processing company.


### INDICTMENT BY FEDERAL GRAND JURY

65. On April 6, 2016, ESKANOS, CALLAS, SMITHLING, and LITTLEFORD were indicted by

a Federal Grand Jury for violations of Title 21, United States Code, Section 846; Title 21,

United States Code, Section 841(a)(1), (b)(1)(C), and (b)(2); Title 18, United States Code,

Section 1956(h); and Title 18, United States Code, Section 1956(a)(1)(A)(i).

**ARRESTS AND EXECUTION OF FEDERAL SEARCH WARRANTS**

66. On April 8, 2016, the Honorable Michael E. Hegarty, United States Magistrate Judge for the District of Colorado issued search warrants for CROWN POINT PHARMACY, SKY RIDGE PHARMACY, and SKY RIDGE COMPOUNDING PHARMACY to search for and seize any evidence related to violations of Title 21, United States Code, Sections 841 and 846; and all records that constitute evidence, fruits, or instrumentalities of violations including money laundering promotion (Title 18, United States Code, Section 1956(a)(1)(A)(i)) or money laundering conspiracy (Title 18, United States Code, Section 1956(h)) for the period of January 1, 2010 through present.

67. On April 12, 2016, Drug Enforcement Administration investigators arrested CALLAS, ESKANOS, LITTLEFORD, and SMITHLING on the federal arrest warrants issued by the District of Colorado upon their indictment on April 6, 2016. Federal law enforcement officers also executed the federal search warrants upon CROWN POINT PHARMACY, SKY RIDGE PHARMACY, and SKY RIDGE COMPOUNDING PHARMACY.

68. On April 12, 2016**,** CALLAS was contacted while opening up CROWN POINT PHARMACY, advised that DEA was there to execute a search warrant of the pharmacy, and advised of his Miranda rights. CALLAS consented to be interviewed. During the subsequent interview, CALLAS informed investigators that CROWN POINT PHARMACY uses SUBJECT PREMISES to store old records, including credit card receipts, third party insurance logs, patient signature logs, and older hard copies of prescriptions. CALLAS estimated the storage unit contains approximately 30 boxes of records. According to CALLAS, the SUBJECT PREMISES is leased in the name of Stanley CALLAS and CROWN POINT PHARMACY. He stated that he has rented the unit for about four months.

30

69.  Upon searching  CROWN POINT PHARMACY on April 12, 2016,  and initial review of documents seized during the execution of the federal search warrant,  not all prescriptions, logs, notes, ledger, etc. used to identify the person purchasing dispensed controlled substances from the time period January 1, 2010 to the present were located at CROWN POINT PHARMACY.

70. On April 13, 2016, DEA Special Agents issued an administrative subpoena to StorQuest-Parker/Cottonwood, 16980 Cottonwood Drive, Parker, CO 80134.  The agents confirmed with StorQuest officials that Stan Callas, with a listed address of 9397 Crown Crest Blvd #101, Parker, CO 80138 rented unite E-191 (SUBJECT PREMISES) beginning on or about October 20, 2015.  DEA agents confirmed the unit continues to be leased by CALLAS.

## CONCLUSION AND ORDERS SOUGHT

71. Based on the investigation described above, probable cause exists believe that CALLAS, ESKANOS, and others discussed within this affidavit, have engaged in Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Money Laundering Using Illegal Proceeds to Promote Illegal Activity and Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and (h). Based on the aforementioned facts, and on your Affiant's training and experience, your Affiant submits there is probable cause to believe that evidence related to violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956(a)(1)(A)(i) and (h), as enumerated in Attachment B, is presently located at the premises identified in Attachment A.

31

72. Your affiant therefore respectfully requests a search warrant be issued authorizing the search of the location identified in Attachment A for items described in Attachment B.

73. The execution of the warrants will begin after the issuance of the warrant and will be returned within ten (10) days.

I, Daniel McCormick, a DEA Diversion Investigator, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

*s/Daniel McCormick*
Daniel McCormick, Diversion Investigator
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means on _____April 14_____, 2016.

MICHAEL HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

This Application and Affidavit was reviewed and submitted by AUSA Peter McNeilly